## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF WEST PALM BEACH<br>401 Clematis Street<br>West Palm Beach, FL 33401 | |
| Plaintiffs, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS<br>441 G. Street NW<br>Washington, DC 20314 | Civil Action No. _____ |
| UNITED STATES FISH AND<br>WILDLIFE SERVICE<br>1849 C Street<br>Washington, D.C. 20240 | |
| UNITED STATES DEPARTMENT<br>OF THE INTERIOR;<br>1849 C St. NW<br>Washington, DC 20240 | |
| FEDERAL HIGHWAY ADMINISTRATION,<br>an agency of the U.S. Department<br>of Transportation<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590 | |
| U.S. ENVIRONMENTAL PROTECTION<br>AGENCY<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460 | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This action challenges the collective decision-making of four different federal agencies that led to the approval of an unnecessary and environmentally harmful roadway project in violation of multiple environmental laws.

2.      Specifically this action challenges the following: the Environmental Assessment dated December 2014 and the Finding of No Significant Impact dated February 19, 2015 prepared by the Federal Highway Administration (**FHWA**) and Florida Department of Transportation (**FDOT**); Department of Army permit number SAJ-2015-01094 issued by the Jacksonville District of the United States Army Corps of Engineers on July 20, 2017; the Department of the Army Environmental Assessment and Statement of Findings for Permit Application SAJ-2015-01094 (SP-RLT) dated June 19, 2017 and amended on July 17, 2017; and the Biological Opinion dated November 13, 2014 issued by the United States Fish and Wildlife Service (**USFWS**).

3.      Together, these agencies funded and issued approvals for a roadway project that allows for the direct and indirect destruction of hundreds of acres of federally protected wetlands, the loss or degradation of habitat for multiple endangered species, the introduction of nutrient laden stormwater into a low-nutrient wetland, and multiple other direct, indirect and cumulative impacts to the regional ecosystem of West Palm Beach, Florida. Plaintiff files this suit to challenge the agencies' failure to comply with federal law and to prevent the permanent destruction of a pristine remnant of the Everglades that also serves as a major source of public drinking water.

4.      As depicted on the map below, the project being challenged through this action (**Project**) is the 8.5 mile extension of existing State Road 7 from Okeechobee Boulevard north to County Road 809A (Northlake Boulevard) in Palm Beach County, Florida. The southern segment of the proposed State Road 7, extending from Okeechobee Boulevard to 60th Street, will expand

2

4.4 miles of existing two-lane road into four lanes and will be constructed in a right-of-way that is directly adjacent to the Pond Cypress Natural Area. The northern segment of the Project, stretching from 60th Street to Northlake Boulevard, will create 4.1 miles of four-lane roadway where none currently exists and will be constructed in a right-of-way that is directly adjacent to Grassy Waters Preserve—a 23 square mile wetlands ecosystem that serves as the freshwater supply for over 130,000 residents of the City of West Palm Beach and the towns of Palm Beach and South Palm Beach. Grassy Waters Preserve is also known as the Water Catchment Area and is solely owned by the City of West Palm Beach. The majority of this state-designated natural preserve consists of oligotrophic (*i.e.* low nutrient) wetlands that provide regional ecological and environmental benefits, including water recharge, water quality and wetland habitat for numerous species protected pursuant to the Endangered Species Act, including the endangered Everglade snail kite *(Rostrhamus sociabilis plumbeus)* and the wood stork *(Mycteria ameriana)*.



5.      Congress, through the passage of various environmental laws, has emphasized repeatedly that all federal agencies must give careful consideration to decisions that impact the environment. When an agency's action will significantly affect the environment, the National Environmental Policy Act requires the agency to prepare an Environmental Impact Statement to evaluate all of the reasonably foreseeable environmental impacts of its decision, carefully consider

alternatives with less impacts, and fully mitigate those impacts that cannot be avoided.  Similarly, the Endangered Species Act requires federal agencies to engage in a consultation to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species. Finally, the Clean Water Act forbids the United States Army Corps of Engineers (**Corps**) and United States Environmental Protection Agency (**EPA**) from issuing permits to dredge and fill wetlands unless the agencies have determined that the activity would not have an unacceptable adverse impact on the ecosystem, that there are no practical alternatives that would result in less impacts, that there will be no degradation of water quality, that the public interests are balanced, and that there will be no net loss of wetland functions.

6.      The defendant agencies sidestepped their legal duties and unlawfully approved the Project without fully evaluating environmental impacts or the viability of less harmful alternative alignments. FDOT settled on the alignment of the roadway in 2006, rendering meaningless any future review of alternatives with less environmental harm. The FHWA signed off on funding the Project with the bare minimum of analysis, despite the fact that the other agencies initially indicated that further review was required.  When the project came to them for their approval, the Corps and EPA did not require FDOT to rigorously explore alternative alignments (despite previously calling for analysis of nearby alternative alignments that would eliminate virtually all environmental harm), ignored the full scope of environmental impacts, and did not require a mitigation plan that would fully off-set impacts. In addition, the Corps and EPA suddenly abandoned the process of elevated permit review – which was required because the Project will result in impacts to wetlands that have been designated as an Aquatic Resource of National Importance due to their rarity and uniqueness. Despite the fact that the Corps, EPA and USFWS had previously expressed concerns with the environmental impacts of the Project and lack of

vigorous review, it was approved by the same agencies with little additional analysis and virtually no change from the 2006 proposal.

7.     The USFWS engaged in a consultation with the FHWA that failed to consider the full scope of the Project's impacts on protected species and that was based on mitigation that provided no additional benefit to those species.

8.     Finally, all the agencies outright ignored the impacts of the nutrients and other pollutants that the roadway Project's stormwater management system will discharge into the oligotrophic wetlands of Grassy Waters Preserve, choosing instead to defer to a local agency's flawed permit process.  Requests to the defendant agencies to examine the effects of degradation from nutrient enrichment were disregarded, even though it is a problem that already exists. The defendants' abdication of their responsibilities to consider the impacts of the discharge of nutrient laden stormwater into Grassy Waters Preserve violated the Clean Water Act, Endangered Species Act, and National Environmental Policy Act and is an arbitrary and capricious final agency action under the Administrative Procedure Act.

## I.     JURISDICTION AND VENUE

9.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question under the laws of the United States, including the National Environmental Policy Act (**NEPA**), 42 U.S.C. § 4321 *et seq*.; the Administrative Procedures Act (**APA**), 5 U.S.C. § 701 *et seq*.; the Clean Water Act (**CWA**), 33 U.S.C. § 1344 *et seq*.; and the Endangered Species Act (**ESA**), 16 U.S.C. § 1531 *et seq*. Plaintiff has exhausted all administrative remedies available to it as required by the APA. Plaintiff's request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 and 5 U.S.C. § 706(2)(A).

10.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) as the defendants include agencies of the United States and officers and employees of the United States acting in their official capacities who reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## II.    PARTIES

11.    The City of West Palm Beach (**City**) is a municipality incorporated under the laws of Florida.  The City and its citizens have substantial interests in the preservation of the flora, fauna, and water quality of Grassy Waters Preserve. The City owns all 23-square miles of Grassy Waters Preserve, which has a public visitor and nature center and serves as a popular destination for recreational kayaking, canoeing, hiking, birdwatching and educational activities. The City dedicates its resources to maintaining and promoting Grassy Waters Preserve as an amenity for its citizens. *See* http://wpb.org/grassywaters/. Grassy Waters Preserve serves as the primary source of drinking water for the 130,000 residents of the City as well as the Town of Palm Beach and the Town of South Palm Beach.  The water levels and water quality of Grassy Waters Preserve are also managed as habitat for a wide range of species.  These interests are adversely affected by Defendants' failure to comply with the APA, NEPA, CWA, and ESA with regard to the proposed construction of the roadway. Plaintiff's requested relief will redress the injuries of the City and its citizens.

12.    Defendant FHWA is an agency of the federal government within the United States Department of Transportation. FHWA was responsible for FDOT's request for Location and Design Concept Acceptance for State Road 7. FHWA was responsible for evaluating the environmental impacts of the proposed Project under NEPA.

13.     Defendant Corps is an agency of the federal government within the United States Department of the Army. The Corps is responsible for issuing permits to dredge and fill waters of the United States pursuant to Section 404 of the CWA.

14.     Defendant USFWS is a federal agency within the United States Department of the Interior. The Secretary of the Interior has delegated to USFWS responsibility for administering and implementing the ESA.

15.     Defendant EPA is an agency of the federal government headquartered in the District of Columbia. EPA has concurrent authority over certain aspects of the CWA.

### III.     STATUTORY AND REGULATORY FRAMEWORK

**A.     Administrative Procedures Act**

16.     The APA governs the scope of review of Plaintiff's ESA claims against USFWS and FHWA, CWA claims against the Corps and EPA, and NEPA claims against the Corps and FHWA. Because these statutes contain no internal standards of review, section 706 of the APA, 5 U.S.C. § 706, provides the standard of review for the agency actions at issue. *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982).

17.     The APA states, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

18.     The APA provides "the reviewing court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or which have been taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**B.     National Environmental Policy Act**

19.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The Council on Environmental Quality (**CEQ**) promulgated regulations that govern an agency's implementation of NEPA. 40 C.F.R. § 1500 *et seq*. Additionally, many federal agencies have promulgated their own regulations or guidance documents that govern the NEPA process. The FHWA's NEPA regulations are found at 23 C.F.R. § 771.101 *et seq*. The Corps NEPA regulations are set forth at 33 C.F.R. Part 230.

20.     NEPA's purpose is to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and "to help public officials make decisions that are based on understanding of environmental consequences . . . ." 40 C.F.R. § 1500.1(b)-(c). Hence, NEPA requires federal agencies to take a "hard look" at the potential direct and indirect impacts of proposed actions, as well as the cumulative impacts of those actions. *Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 863–64 (D.C. Cir. 2006); "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgement of potential environmental harms." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005) (*citing Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). This is to ensure that the agencies and the public are properly informed about the full scope of environmental consequences of proposed action before they happen.

21.     NEPA requires all agencies of the federal government to prepare a "detailed statement"—an Environmental Impact Statement—regarding all "major federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). This duty extends to any federal actions that *"will or may"* have a significant effect on the environment. 40 C.F.R. § 1508.3 (emphasis added). The agency's recommendation must include a detailed

statement of the environmental impacts, any adverse environmental effects that cannot be avoided, alternatives to the proposed action, including a no action alternative, the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *See* 42 U.S.C. § 4332. This requirement is designed to ensure that NEPA's environmental protection policies are integrated into environmental decision-making and provide a means by which decision-makers and the public can evaluate the environmental impacts of government proposals. 40 C.F.R. §§ 1501.1(a), 1502.1.

22.     NEPA establishes several criteria for determining whether an impact is significant. Whether the impacts of an action may be "significant" within the meaning of NEPA depends on both context and intensity. *Id.* § 1508.27. "Context" "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). "Both short- and long-term effects are relevant." *Id.* "Intensity" refers to the severity of impact and requires the agency to evaluate a number of factors. *Id.* § 1508.27(b). Among these are the "degree to which the proposed action affects public health or safety," the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands [and] ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the action may establish a precedent for future actions with significant effects," "whether the action is related to other actions with ... cumulatively significant impacts," and "the degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *Id.*

23.     In reviewing the effect an action may have on the environment, and in considering the effects of possible alternatives, the agency must consider the direct, indirect and cumulative impacts on the environment. 40 C.F.R. § 1508.8 ("[e]ffects and impacts . . . are synonymous . . . [and include] direct, indirect, or cumulative" effects). "Direct effects . . . are caused by the action and occur at the same time and place." *Id.* "Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

24.     When an agency is uncertain whether an activity will have a significant effect on the environment, and thus, whether it has a duty to prepare an Environmental Impact Statement (**EIS**), the agency may prepare an Environmental Assessment (**EA**) to assist it in determining whether the action may have a significant environmental effect. 40 C.F.R. §§ 1508.9, 1501.4. The EA must include "discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). The agency must "provide sufficient evidence and analysis" of the direct, indirect and cumulative environmental impacts of the proposed action and the alternatives considered to support its "determination whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(l).

25.     If, after preparing an EA, the agency determines that there will be no significant impact, it must prepare a "finding of no significant impact" and make the finding available to the public. 40 C.F.R. §§ 1501.4, 1508.13. Even if the agency properly decides that an EIS is unnecessary, its EA must be sufficiently detailed to adequately address potential impacts and reasonable alternatives. 40 C.F.R. §§ 1508.9.  The Corps may not blindly adopt another agency's NEPA document. 33 C.F.R. § 230.21.

26.     In addition, CEQ regulations provide that meaningful public participation and oversight is essential to the NEPA process. Facilitating public input is a central element of the NEPA process. *See, e.g.,* 40 C.F.R. §§1500.1(b) ("[a]ccurate scientific analysis, expert agency comments and public scrutiny are essential to implementing NEPA"); *Id.* ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.")

27.     NEPA also provides that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

28.     In analyzing alternatives, NEPA requires an "intense consideration of other more ecologically sound courses of action." *Envtl. Def. Fund, Inc. v. U.S. Army Corps of Eng'rs*, 492 F.2d 1123, 1135 (5th Cir. 1974); *see also* 40 C.F.R. § 1502.16.

**C.     Clean Water Act**

29.     Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any pollutant into the waters of the United States, including wetlands, without a permit. 33 U.S.C. § 1311(a). The term "pollutant" includes "dredge spoil," "solid waste," "rock, sand, cellar dirt and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

30.     Section 404 of the CWA authorizes the Corps to issue permits for the discharge of "dredged or fill materials" into waters of the United States. In reviewing applications for CWA 404 fill permits, the Corps must follow its own regulations at 33 C.F.R. § 320-330 and EPA regulations at 40 C.F.R. § 230.1-230.80.

31.     The EPA's Section 404 guidelines explain that "the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts," and "[t]he guiding principle should be that degradation or destruction of special [wetland] sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1. As a result, "[d]redged or fill material should not be discharged into the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c).

32.     EPA's Section 404 guidelines establish several prohibitions to discharges to wetlands. First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ." 40 C.F.R. § 230.10(a). The inquiry into practicability goes to both on-site and off-site - that is "internal" and "external" - alternatives. Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85336, 85339 (Dec. 24, 1980); Guidelines for Specification of Disposal Sites for Dredged or Fill Material (44 Fed. Reg. 54222, 54223 (Sept. 18, 1979).

33.     An alternative is deemed practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project

purposes." 40 C.F.R. § 230.10(a)(2). The inquiry into "cost" involves whether the alternatives to be considered are "reasonable in terms of the overall scope/cost of the proposed project"; under such an analysis, an alternative is not practicable if it is "unreasonably expensive.", 45 Fed. Reg. at 85339, 43.

34. The EPA's guidelines establish a strong presumption that there are practicable alternatives to the discharge of fill to wetlands if the activity to be permitted is not "water dependent," that is, if it "does not require access or proximity to or siting within" a wetland "to fulfill its basic purpose," such as a marina. It is the burden of the applicant to rebut the presumption by *"clearly demonstrat*[*ing*]*"* that there is no other practicable alternative that would avoid or minimize the wetlands losses. 40 C.F.R. § 230.10(a)(3). "In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, *unless clearly demonstrated otherwise." Id*. (emphasis added).

35. The Corps is prohibited from issuing a Section 404 permit unless there is "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the] Guidelines." 40 C.F.R. § 230.12(a)(3)(iv). "[A]ll requirements in § 230.10 must be met" before a permit may issue. 40 C.F.R. § 230.10.

36. A second prohibition to issuing a permit under the EPA's 404 guidelines is that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). "[E]ffects contributing to significant degradation considered individually or collectively, include: [s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites."

*Id.; see also id. at* 40 C.F.R. § 230(c)(2),(3), (4). "Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients [or] purify water." 40 C.F.R. § 230.10(c)(3). "Significant" in this context means anything that is "more than trivial." 45 Fed. Reg. at 85343. The Corps must base its "significant degradation" determination on the potential short-term or long-term effects, including cumulative and secondary effects, of the proposed discharge on the physical, chemical, and biological components of the aquatic environment. 40 C.F.R. §§ 230.10(c); 230.11 (g), (h). "Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." 40 C.F.R. § 230.11(h).

37.     A third prohibition under the Section 404 Guidelines is that - even if the Corps finds that there are no practicable alternatives for a proposed project - "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). "[A]ll reasonable reduction in impacts [must] be obtained." 45 Fed. Reg. at 85344.

38.     Compensatory mitigation (*e.g.* replacement of the functions of wetlands lost due to the project), is considered only after all appropriate and practicable steps have been taken to first avoid and then minimize adverse impacts to the aquatic ecosystem pursuant to Section 404(b)(1). 40 C.F.R. §230.10(d). The Corps must properly condition permits with mitigation conditions. 33 C.F.R. §325.4. The 2008 mitigation rule provides for detailed requirements and a preference among mitigation types. 33 C.F.R. Part 230 Subpart J. *See* 73 Fed. Reg. 19594 (Apr. 10, 2008).

39.     Under the Corps' regulations, the public notice requirements mandate that Section 404 permit applicants include in the permit all activities "reasonably related" and provide a complete description of such activities "sufficient for public notice." 33 C.F.R. §§ 325.1(d)(1)-(2). Once the application is complete, the Corps must issue a public notice soliciting comments from interested persons. 33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3. Public notice is the "primary method of advising all interested parties of the proposed activity . . . and of soliciting comments and information necessary to evaluate the probable impact on the public interest." 33 C.F.R. § 325.3(a). Thus, the notice must include "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment;" and it must include a description of the proposed activities, and all "available information which may assist interested parties in evaluating the likely impact of the proposed activity . . . ." Id.  A public hearing must be provided "whenever a public hearing is needed for making a decision," and requests for a public hearing "shall be granted,  unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." 33 C.F.R. §§ 327.4(a)-(b). "In case of doubt, a public hearing shall be held." Id. at § 327.4(c).

40.     The Corps' regulations provide that "[n]o permit will be granted which involves the alteration of wetlands identified as important" unless the Corps finds, after its "public interest review," that "the benefits of the proposed alteration outweigh the damage to the wetlands resource," and that the proposed alteration is necessary to realize those benefits. Id. § 320.4(a), (b). In its review, the Corps must consider "[a]ll factors which may be relevant to the proposal" including "the cumulative effects" of the project. 33 C.F.R. § 320.4(a)(1). The Corps must consult with the USFWS "with a view to the conservation of wildlife resources by prevention of their

direct and indirect loss and damage due to the activity proposed in a permit application." 33 C.F.R. § 320.4(c).

41.     The Corps' regulations provide eight criteria for determining whether any given wetlands "perform functions important to the public interest," including: whether the wetlands "serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic and land species;" whether they have been "set aside for study of the aquatic environment or as sanctuaries or refuges," whether the wetlands are of such character that the "destruction or alteration of which would affect detrimentally . . . other environmental characteristics;" whether they "serve significant water purification functions"; and whether they are "unique in nature or scarce in quantity to the region or local area." 33 C.F.R. § 320.4(b)(2).

42.     Section 404(q) of the CWA requires the Corps and EPA to enter into an agreement assuring that delays in the issuance of Section 404 permits are minimized. In 1992, EPA and the Corps signed a Memorandum of Agreement (**1992 MOA**) that outlines the process for resolving disputes. Pursuant to the 1992 MOA, EPA may request that applications for CWA Section 404 permits receive a higher level of review by the Corps if the permit will result in unacceptable adverse effects to an Aquatic Resource of National Importance (**ARNI**).

43.     The EPA has final supervisory authority over the Corps' administration of, and compliance with, Section 404 of the CWA for the issuance of permits for the discharge of dredged or fill material. Pursuant to Section 404(c) of the CWA, 33 U.S.C. § 1344(c), EPA has authority to prohibit the specification of a disposal site where discharges "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.*

**D.      Endangered Species Act**

44.      Congress enacted the ESA to provide "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved" and "a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531 (b). The ESA imposes duties on the Secretary of the Interior. These duties have been delegated to the USFWS for certain species. 50 C.F.R § 402.01(b).

45.      The ESA protects species listed as "endangered" or "threatened." 16 U.S.C. § 1532(6), (16), (20). Section 9 of the ESA and implementing regulations prohibit the "take" of endangered and threatened species without a permit. 16 U.S.C. § 1538(a)(1). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Person" includes "any officer, employee, agent, department, or instrumentality of the Federal Government . . . ." 16 U.S.C. § 1532(13).

46.      Section 7 of the ESA requires each federal agency to consult with the USFWS to "insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The USFWS has promulgated regulations at 50 C.F.R. § 402 that implement the consultation requirements of section 7. Under the USFWS' regulations, each federal agency must review its actions and determine if they "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). If an agency action "may affect" an endangered or threatened species, the agency must engage in "formal consultation" with the USFWS, unless the USFWS "concur[s]" in writing that the action is not likely to "adversely affect" any threatened or endangered species. 50 C.F.R. § 402.14(b).

47.      The federal agency responsible for consulting with the USFWS must provide the Service with a "biological assessment" of a proposed project's effects on endangered or threatened

species, which includes "the best scientific and commercial data available . . . for the adequate review of the effects that an action may have upon listed species . . . ." 50 C.F.R. § 402.14(c), (d). The USFWS must then review all relevant information and "evaluate the effects of the action and cumulative effects on the listed species," and "formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species." 50 C.F.R. § 402.14(g)(2)-(4).

48.    At the culmination of the USFWS' consultation, the agency issues a biological opinion that details how the agency's action affects the listed or endangered species. 16 U.S.C. § 1536(b)(3)(A). The biological opinion must also provide the Service's opinion as to whether the agency action is "likely to jeopardize" the continued existence of a listed species. 50 C.F.R. § 402.14(h)(3). If the USFWS determines that an agency action is unlikely to jeopardize an entire species but will result in the "take" of an individual members of the species, the USFWS must issue an "Incidental Take Statement" in which the USFWS must identify the anticipated impact to the species, reasonable and prudent measures to minimize such impact, and "terms and conditions" that must be complied with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). If the USFWS determines the action is likely to jeopardize a listed species, the Service must specify "reasonable and prudent alternatives" to insure that such jeopardy is not likely to occur. 16 U.S.C. § 1536(b)(3)(A). The USFWS is required to reopen its Section 7 biological opinion (*i.e.* reinitiate consultation) if any of four factors are met indicating that the effects of the action on the species are different than as analyzed in the biological opinion. 50 C.F.R. § 402.16.

**E.    Summary of Allegations**

49.    This action alleges violations of several different overlapping processes and approvals.

50.     First, this suit challenges the FHWA's and Corps' findings under NEPA as set forth in FHWA's February 29, 2015 Finding of No Significant Impact (**FONSI**) as based on the December 2014 EA, and the Department of the Army Environmental Assessment and Statement of Findings (**EA/SOF**) for Permit Application SAJ-2015-01094 dated June 19, 2017 and amended on July 17, 2017. In 2015, the FHWA concluded that the proposed roadway would have no significant harm to the environment and therefore failed to prepare an EIS to assess the full range of impacts to the affected environment. The February 2015 FONSI and the December 2014 EA are riddled with factual and legal errors on a range of issues. The FHWA made the decision to shortcut the NEPA process despite the fact that other agencies such as USFWS reached the conclusion that the need for an EIS was obvious.

51.     In 2017 the Corps prepared an abbreviated NEPA analysis based largely on the record developed by the FHWA. The Corps failed to take a hard look at the underlying analysis and conclusions of the faulty 2014 EA. Rather than rejecting the 2015 FONSI and the 2014 EA as inadequate, the Corps adopted the erroneous facts and conclusions of the FHWA and simply incorporated them into its own document. The agencies' arbitrary and capricious findings violate the APA, 5 U.S.C. § 706 and are unlawful under NEPA, 42 U.S.C. § 4321 *et seq.*

52.     Second, this suit challenges the consultation conducted by the FHWA and USFWS, culminating in the Biological Opinion (**BiOp**) issued by the USFWS on November 13, 2014.  In its 2014 BiOp, despite finding that the proposed roadway will have significant adverse effects on federally listed species and finding that Grassy Waters Preserve serves as a critical refuge for the Everglades snail kite during periods of drought, the USFWS found that the proposed State Road 7 roadway is not likely to jeopardize the continued existence of the Everglade snail kite. The USFWS underestimated the direct and indirect impacts of the Project and overestimated the value of the

mitigation. The USFWS' arbitrary and capricious finding violates the APA, 5 U.S.C. § 706 and is unlawful under the ESA, 16 U.S.C. § 1531 *et seq*.

53.    Additionally, the agencies further violated those statutes when they later refused to reinitiate biological consultation on the proposed roadway after being presented with information demonstrating that the stormwater management system that will receive runoff from State Road 7 will have direct effects on endangered species and their habitat by introducing phosphorous and other pollutants into the oligotrophic wetlands of Grassy Waters Preserve, thereby permanently altering water quality and degrading habitat. In fact, the current operation of the Ibis Golf and Country Club residential development water management system (which is adjacent to the northern segment of the proposed road) is already resulting in "take" of threatened and endangered species and this habitat loss will be exacerbated and accelerated when the Project is constructed and tied into the Ibis system.

54.    Finally, this action challenges the Corps' unlawful issuance of a permit under Section 404 of the CWA, for direct impacts to 58.52 acres and secondary impacts to 159.96 acres of wetlands along the corridor of the Project.  More specifically, the Corps unlawfully issued the permit without meaningfully analyzing practicable alternatives; without fully examining the proposed roadway's secondary and cumulative impacts; allowing significant degradation of Grassy Waters Preserve; failing to consider the public interest; without requiring adequate mitigation; and without accurately assessing the impacts on the unique and fragile aquatic ecosystem of Grassy Waters Preserve.  Moreover, the Corps and EPA suddenly abandoned the higher level of review required for permits that will impact ARNI. This is despite the fact that in the middle of their elevation process, the agencies were made aware that the stormwater management system would have substantial and unacceptable adverse impacts on Grassy Waters

Preserve and the values it provides in terms of unique habitat, biodiversity and water supply.   By issuing the Section 404 permit despite these clear shortcomings, the Corps and EPA violated the APA, 5 U.S.C. § 706 and the CWA, 33 U.S.C. § 1344 *et seq.*

55.     Plaintiffs seek remand of the Corps' permit and the USFWS' BiOp so the agencies can accurately and thoroughly evaluate the environmental impact of the Project on wetlands and federally listed species. For the agencies and the public to have a full understanding of the effects of the proposed roadway, Plaintiff seeks a remand so the FHWA or the Corps can conduct a full and accurate EIS that is updated to reflect the full range of potential impacts.

### IV.     FACTUAL BACKGROUND GIVING RISE TO PLAINTIFF'S CLAIMS

**A.     Grassy Waters Preserve**

56.     Grassy Waters Preserve, also known as the Water Catchment Area, is a 14,700-acre (23 square mile) wetland that was historically connected to the Everglades.  The Project would be constructed directly adjacent to, and to the west of, Grassy Waters Preserve. Large portions of Grassy Waters Preserve have the same characteristics as the Everglades, such as having open water marshes with extended hydroperiods. Grassy Waters Preserve is an oligotrophic wetland, meaning that it has low nutrient concentrations and has an ecosystem that thrives only in low nutrient conditions.

57.     The City owns Grassy Waters Preserve and maintains it as both the primary source of municipal drinking water and as an environmental, recreational and educational amenity for its citizens and the public. Fresh water from Grassy Waters Preserve is withdrawn, treated, and distributed as drinking water to the City, the Town of Palm Beach, and the Town of South Palm Beach. Because of its ecological and strategic importance, Grassy Waters Preserve and the adjacent portions of the M Canal are protected by a special act of the Florida Legislature, which

forbids their use for any purpose that is "inconsistent with water supply, environmental, educational, or conservation purposes . . . ." Laws of Florida, Ch. 96-477, § 3; Laws of Florida, Ch. 2006-359, § 2.

58.     Grassy Waters Preserve is habitat for numerous species that have been designated as endangered or threatened, including wood storks, red-cockaded woodpeckers, sandhill cranes, white ibises, and little blue herons. Additionally, Grassy Waters Preserve serves as a critical nesting and foraging area for the endangered Everglade snail kite, a bird of prey that gets its name because of a highly specific diet composed almost entirely of apple snails. Grassy Waters Preserve is adjacent to property belonging to the Solid Waste Authority of Palm Beach County, which contains one of the largest roosts for snail kites in Florida, with up to 200 individuals observed there at any one time. Snail kites from that roost primarily forage in Grassy Waters Preserve given that it is the only wetland area with high production of apple snails within the foraging range of the roost. While snail kite nests can be hard to detect, it is undisputed that snail kites have nested very close to the proposed Project.

59.     A sufficient population of apple snails must be present in a wetland to support snail kites. Apple snails depend on an open marsh and low-nutrient oligotrophic conditions. The conditions in Grassy Waters Preserve are ideal for apple snail production and kite foraging. Apple snails consume periphyton, which is an assemblage of algae. Many other fish and invertebrate species that form the basis of the wetland food chain also depend on periphyton. Periphyton can only survive when the concentration of nutrients such as phosphorus are less than 10 parts-per-billion (**ppb**). If phosphorus levels rise, the periphyton community collapses and the open marsh is replaced with dense vegetation such as cattails. If the vegetation in a wetland becomes too dense, apple snail production drops and snail kites are unable to effectively feed on any apple snails that

may be present because the snails are too difficult to locate from the air and to prey on.  Thus, increased nutrient levels in Grassy Waters Preserve would have a significant impact on snail kite survival for those that live and forage in Grassy Waters Preserve.

**Proposed State Road 7**

60.     The Project at issue in this complaint is the proposed extension of State Road 7, which the FDOT first proposed in 1969 and has built piecemeal since.  The proposed Project would involve extending the existing road by 8.5-miles from Okeechobee Boulevard to Northlake Boulevard in Palm Beach County. A large portion of this extension lies within the City of West Palm Beach's boundaries. The southern segment would expand the 4.4 miles of existing two-lane road into four lanes. The existing two-lane segment (south of the M Canal ending at 60th Street) also resulted in wetlands loss when it was constructed. Construction from Okeechobee Blvd. to Persimmon Blvd. was completed in 2005 and construction from Persimmon Blvd. to 60th Street, was completed in 2014.  The northern segment (north of the M Canal to Northlake Boulevard) would create 4.1 miles of four-lane roadway where none currently exists.

61.     The challenged CWA Section 404 permit authorizes FDOT to discharge fill material over 59.97 acres of non-tidal wetlands along the 4.1-mile northern segment. The secondary impacts of the Project will impact 159.96 acres of additional wetlands. The affected wetlands include fresh water marsh, mixed shrubs, and hydric pine flatwoods.

62.     The proposed roadway would typically be approximately 170 feet wide and would include a raised roadway, median, sidewalks, bike lanes. The 4.4 mile southern segment of the Project, from 60th Street to Okeechobee Boulevard, includes a stormwater swale that will tie into an existing stormwater management facility.

63.     As shown in the figure below, stormwater runoff from 3.145 miles of the northern segment will ultimately end up in Grassy Waters Preserve. Stormwater management for this segment relies on an existing surface water management system associated with the Ibis Golf and Country Club residential development. Stormwater runoff from the northern segment will be channeled into an open ditch to the east of the road. The water in the ditch will either percolate into the ground or be directed under the road and into the existing Ibis Lakes, which are meant to provide water quality treatment. Water in the Ibis Lakes flows south into the Ibis Preserve, which is owned by the City. Water from the Ibis Preserve is discharged into Grassy Waters Preserve over an outfall. Under current conditions, the Ibis stormwater management system does not adequately reduce nutrient levels. As a result of changes in water quality, the wetlands of Grassy Waters Preserve in the vicinity of the discharge location are rapidly degrading, with the invasion of dense vegetation already extending out over a mile.



Figure 2

64.     The existing negative impacts from the Ibis stormwater management system are uncontested.  In fact, in August 2017, the SFWMD filed an administrative complaint alleging that the surface water discharges from Ibis have harmed and continue to harm Grassy Waters Preserve. This is evidenced by denser vegetation and cattails in Grassy Waters Preserve at the outfall.  As a result, SFWMD has concluded that there is a reason to believe that there are violations of state water quality standards.

**NEPA Review as part of FHWA's Assessment**

65.     The NEPA review of this Project was initiated by the FDOT in 2000 when it began to prepare a state Project Development and Environmental (**PD&E**) study, as well as an EIS for

the Project.  However, the Project's PD&E study and EIS were suspended in October of 2000,

after the Palm Beach Metropolitan Planning Organization approved a motion to stop the PD&E

Study. The PD&E study was taken up again in 2005 in light of population growth projections that

FDOT believed showed that western portions of Palm Beach County would suffer from traffic

congestion. Without explanation, FHWA decided at this point to study the Project under an EA

rather than an EIS. The agencies never wavered from that decision from then on regardless of the

information in front of them.

66.    In December of 2014, FHWA completed an EA for the Project. The primary

environmental concerns addressed by the EA were the roadway's proximity to Grassy Waters

Preserve, the potential for a truck accident to spill hazardous material into Grassy Waters Preserve

and the City's drinking water source, and the proximity of the proposed road to known snail kite

nests. Yet, the EA largely glossed over these concerns.

67.    To address concerns raised about the proximity of State Road 7 to Grassy Waters

Preserve and the likely direct, indirect and cumulative effects, the FHWA emphasized that no

portion of the roadway would be built directly *in* Grassy Waters Preserve. This ignores the fact

that the roadway will directly impact 59.97 acres of wetlands that are directly adjacent to Grassy

Waters Preserve and are connected hydrologically and in terms of habitat.  Due to proximity the

Project will have other indirect and cumulative effects on the regional ecosystem.

68.    On the issue of roadway spills reaching Grassy Waters Preserve, FHWA noted that

"[t]he guardrail, in combination with the curb and gutter, would help contain vehicles within the

roadway in the event of an accident. Any material spilled on the roadway, if large enough, may

enter the nearest drainage inlet where it may collect or outfall into the drainage swale. The

contaminated material and soil from the swale would then be removed from the site in accordance

with local, state, and federal response procedures." The EA did not analyze how quickly spilled contaminants that reach the permeable, earthen drainage swales could leach into groundwater and nearby Grassy Waters Preserve or be carried in a storm event into the stormwater management system associated with the Ibis Golf and Country Club that is not designed to remove hazardous contaminants.

69.     With regard to the Project's harm to snail kites, the FHWA found it sufficient that activity restrictions would be implemented whenever an active nest is discovered near the Project's construction area. To keep snail kites from colliding with vehicles on the roadway, the FHWA claimed that "mature trees will be planted along the edge of right of way so that snail kites or any other birds will be forced to fly over the roadway and not into oncoming traffic." FHWA did not provide any rationale for its belief that trees would "force" agile snail kites, which routinely roost in trees and routinely pluck apple snails out of wetlands mid-flight, to avoid flying over the roadway.

70.     Importantly, the EA contained no meaningful discussion of the ability of the stormwater management system that serves the Ibis Golf and Country Club residential development to effectively accommodate the increased volume of stormwater that State Road 7 would generate and the impact of increased nutrients in Grassy Waters Preserve. Instead, the EA simply noted that stormwater facilities would satisfy the South Florida Water Management District's design requirements for water quality impacts and therefore "no impacts to water quality are anticipated."

71.     On February 19, 2015, FHWA issued a FONSI for State Road 7 in reliance on the December 2014 EA. The FONSI concluded that State Road 7 "will not have any significant impact on the human environment" and that a more comprehensive EIS was not required. The FONSI was

based on the December 2014 EA, which FHWA claimed "adequately and accurately discuss the environmental issues and impacts of the proposed project."

72.     FHWA failed to take a hard look at a number of environmental impacts in its FONSI that would have made clear the need for a comprehensive EIS.

73.     The direct and indirect loss of 200 acres of wetlands and the potential risk to Grassy Waters Preserve alone warrant the in depth review of an EIS. Contamination from runoff or a spill from a transport vehicle could be catastrophic to the City's water supply. Furthermore, the Project poses a direct threat to one of Florida's largest snail kite roosting areas.

74.     The construction of State Road 7 is also part of a broader change to the regional transportation system. This project will likely lead to further road expansions for Jog Road and Roebuck Road.  As a result, in addition to the direct loss of wetlands, changes in water quality, and impacts on endangered species, the cumulative effects of this Project must also be disclosed and analyzed.

75.     The FONSI also analyzed the impacts of the proposed State Road 7 expansion wholly separate from the impacts of the two-lane, 4.4 mile southern segment of State Road 7 that was already constructed. This segmentation of impacts is improper, as it is clear that FDOT's intent was always to build the entire length of State Road 7. The FONSI, when justifying the selected route, notes that "[t]he benefit of the proposed alignment is that it is located along the edge of existing developments within an existing corridor *reserved for transportation projects*." (*emphasis added*). The State Road 7 Extension should not be evaluated in isolation, but in combination with the impacts caused by the previous projects that are clearly part of unified roadway.

76.     According to the 2014 EA, the purpose of the Project is to provide an efficient connection between Okeechobee Boulevard and Northlake Boulevard for the western areas of

Palm Beach County. While the FONSI acknowledged the reality that the anticipated population growth predicted in the 2005 PD&E study had not materialized due to economic conditions, FHWA cited a traffic study to support the notion that State Road 7 was still needed. The FONSI did not address a separate traffic study commissioned by the City that reached contrary conclusions, even though the City provided that report to the FHWA. Additionally, the FONSI ignored earlier written comments by the Corps that the Project's "environmental impacts far outweigh[]" its "modest network improvements." Furthermore, the FONSI did not address whether State Road 7, beyond merely accommodating current conditions, might induce additional population growth to take place. FHWA ignored the fact that the County approval for several large developments to the west is subject to the assured construction of the State Road 7 expansion.

77.     The Corps' subsequent EA/SOF from June and July of 2017 simply incorporated the flawed findings and analyses of the FHWA's earlier EA/FONSI without providing any additional analysis or justifications to support the FHWA's conclusions.

**Faulty Alternatives Analysis**

78.     NEPA requires federal agencies to rigorously explore and objectively evaluate all reasonable alternatives that would accomplish the purpose and needs of the action. Both FHWA and the Corps failed to study, develop, and describe appropriate alternatives to the selected route for State Road 7 and instead relied exclusively on the flawed, outdated, and self-serving alternatives analyses prepared by FDOT.

79.     In January of 2000, FDOT initiated a PD&E study of eight alternative routes that FDOT had chosen for review in the 1990s. Notably, FDOT also began to undertake a comprehensive EIS for the State Road 7 extension at this time. Both the PD&E study and the EIS were suspended in the fall of 2000 by the Palm Beach Metropolitan Planning Organization. While

efforts to build State Road 7 were revived several years later, neither FDOT nor the federal agencies tried to initiate a comprehensive EIS to fully evaluate the environmental impacts of the proposed roadway.

80.     Due to projected population growth in the western portions of Palm Beach County, FDOT began a second PD&E study in 2005 through which it evaluated only four of the eight alternative routes that it initially planned to study as part of the previous PD&E study that terminated in 2000. FDOT used a series of workshops to analyze the alternative corridors. As shown in the figure below, Corridor 3 largely mirrors the route for State Road 7 that is currently proposed. Corridor 1 would have traveled in a similar route as the one that is currently proposed, except that the northern segment of State Road 7 would have traveled west of the Ibis Golf and Country Club residential development instead of to the east next to Grassy Waters Preserve. Corridors 2 and 4 would have utilized an existing FDOT right-of-way for the southern segment of State Road 7, meaning the roadway would have bisected a large contiguous section of wetlands made up of the Pond Cypress Natural Area (which served as wetlands mitigation for the already constructed segment of State Road 7) and Grassy Waters Preserve.



81.     FDOT predetermined the location of State Road 7 based on land ownership and then undertook an empty analysis of alternatives designed to support that decision. The federal resource agencies determined that corridors 2 and 4 were "fatally flawed" due to the level of impact to conservation, lands, wetlands, and wildlife habitat. The ease with which the federal agencies rejected these unworkable "alternatives" shows that they were merely illusory options that would

allow FDOT to arrive at its preferred corridor. Given their extreme environmental impacts, Corridors 2 and 4 were not "appropriate alternatives" as required by NEPA. 42 U.S.C. § 4332(2)(E).

82. The preferred choice of the federal resource agencies was Corridor 1 because it had significantly fewer environmental impacts than Corridor 3. However, because Corridor 1 was analyzed to occupy an area 320 feet wide through portions of residential areas, it was perceived to have the largest impact on private property. Thus, those that came to the public work sessions opposed Corridor 1. For example, at a public meeting on March 21, 2012, members of the public supported the "fatally flawed" Corridor 4 (405 first place votes) and the "no build alternative" (266 first place votes). Corridor 3, which received a paltry 11 first place votes at the public meeting, was not the preferred corridor of either the federal resource agencies or the public, but was selected by FDOT for further development analysis as a result of the poor alternatives to which it was compared. This faulty logic allowed the transportation agencies to ignore the validity of Corridor 1 as well as other alternatives that could meet the stated purpose of a north/south road in the region.

83. A representative of the City appeared at the March 21, 2012 public meeting and provided comments and supporting documents in opposition to State Road 7. On March 28, 2012, days after the public hearing, the City submitted written comments and objections to the proposed State Road 7 and urged FDOT and FHWA to prepare an EIS related to the Project. On April 2, 2012, the Corps also submitted comments suggesting that additional roadway corridors should be evaluated.

84. After rejecting Corridor 1 due to alleged impacts to residences that would result from the construction of a 320-foot wide road, the transportation agencies radically altered the design of State Road 7 to reduce its width to 120 feet in order to demonstrate that they could

minimize impacts within their preferred Corridor 3. Despite the radical reduction in the size of the proposed road, the agencies made no effort to re-evaluate the impacts that a 120-foot wide road would cause to residences along Corridor 1 or determine whether the public would be more amenable to a smaller road along Corridor 1.

85.     In 2014, FDOT prepared a Corridor Report Addendum that evaluated two additional potential State Road 7 corridors, with a total of five alternative routes within those corridors, to the west of the preferred corridor route, along 60th Street and 130th Avenue North. FDOT ultimately concluded that these corridors were not acceptable alternatives to the recommended alternative of Corridor 3 that was presented in the March 21, 2012 Public Hearing. Once again, FDOT rejected out of hand alternatives that clearly would have had less environmental impacts under the theory that residential relocations made them impracticable.  Furthermore, by identifying State Road 7 as the starting point for a connector between Okeechobee Boulevard and Northlake Boulevard, the Addendum evaluated a few alternative alignments but no true alternative corridors.

86.     Importantly, FDOT never re-evaluated whether Corridor 1, the route originally preferred by the federal agencies, would be a viable alternative given that the width of the roadway had been reduced by 250 percent.

87.     FDOT concluded in its 2015 FONSI that the roadway alignment selected (Corridor 3) was the "Preferred Alternative to minimize impacts to wetlands and natural habitats" and was selected after "extensive coordination with the environmental agencies." FDOT's claim that the chosen roadway alignment minimized environmental impacts compared to other available routes and its claim that the environmental agencies supported the chosen road alignment were objectively false – the road could be built in Corridor 1 with almost zero impacts to wetlands,

endangered species and Grassy Waters Preserve. In turn, while it is true that Corridor 3 would result in less impacts than Corridors 2 and 4, both of those were illusory choices.

88.     Contrary to the EA and later to the Corps' EA/SOF, the preferred alternative of Corridor 3 was not the common preferred corridor among the public and environmental agencies. On multiple occasions USFWS and the Corps recommended that FDOT discard the proposed alignment and reinstate a "west of Ibis" alternative as a potential alignment for the Project. In a letter to FDOT dated May 27, 2010, the Corps expressed concern with FDOT's decision to dismiss the alternative that was located to the west of Ibis Development. The Corps also made clear that it is the agency's "opinion that an increase in residential relocations is not enough to eliminate an alternative."  In the same letter, the Corps stated that "any roadway design as part of a build alternative should be reduced in cross section so that only the minimum necessary to achieve the project purpose is constructed."  The Corps repeated its concerns in 2012, noting that other less damaging alternatives exist, and achieve the project purpose, but have not been sufficiently evaluated recommending exploration of numerous other alternatives. These comments fell on deaf ears at FHWA. Incredibly, the Corps' EA/SOF later stresses the fact that alternatives to the west of Ibis were primarily eliminated due to residential relocations. The Corps' sudden support for the preferred alternative is the essence of an arbitrary decision.

89.     On February 29, 2012, USFWS also urged FHWA to adopt an alternative west of Ibis.  FDOT responded in 2012 that this would not be pursued due to potential protests from the communities to the west "adding many more years to the study process and potentially resulting with the selection of the No-Build option." USFWS reiterated its concerns with the lack of objective analysis of alternatives on December 12, 2012 and on February 28, 2013. In a letter dated September 25, 2013, FDOT again reiterated that such an alternative would not be explored because

it would lead to private property impacts and would delay the process, stressing again how the alternatives were chosen as a result of a public process "that discarded other corridors further west."

90.     FHWA and the Corps rely on the 2006 PD&E Study and the 2014 Corridor Report Addendum as evidence that FDOT satisfied the alternatives analysis requirements under NEPA. Neither of these documents provide the rigorous analysis of alternatives required under the federal environmental laws. The agencies ignored contrary evidence presented to them demonstrating that the alternatives to the west (which would not result in wetlands loss, impacts to endangered species habitat or a risk to Grassy Waters Preserve) were practicable.  It is clear that alternatives discussed in the Addendum are practicable and should have been subjected to further analysis and independent confirmation.

91.     FDOT also narrowly defined the purpose and need for State Road 7 to ensure that its preferred alignment would be chosen. A properly defined purpose and need is a key factor in the NEPA analysis because an agency can dismiss, without detailed study, any alternative that fails to meet the project's purpose and need. The transportation agencies dismissed many viable alternatives and the Corps mistakenly deferred to their analysis and conclusion.

**Failure to Prepare EIS**

92.     FHWA failed to prepare an EIS in order to fully understand the impacts of the Project despite evidence of the need to do so.  On February 8, 2012, USFWS wrote the agencies a comment letter stating that the Project clearly meets the definition of a major federal action that significantly affects the quality of the human environment, thereby requiring an EIS.  This was reiterated on numerous occasions by the resource agencies and in public comments, including letters from USFWS dated June 25, 2013 and the Biological Opinion of November 13, 2014.

93.     The Corps had its own opportunity to undertake an EIS that would address the very issues that it had raised itself in comments to FHWA. The Corps' regulations, 33 C.F.R. § 230.21, make clear that the agency should not adopt a NEPA document that it finds inadequate. Again, the other resource agencies urged preparation of an EIS.  In a letter dated September 28, 2015, EPA stated that "[f]or purposes of compliance with the National Environmental Policy Act (NEPA) with respect to the activities regulated under CWA Section 404, the EPA believes that the EA/FONSI was not comprehensive and did not include any indirect and cumulative impact analysis." EPA cautioned the Corps against simply adopting the EA/FONSI without further analysis including what additional development will be spurred by the new roadway in the Project study area that could further impact waters of the United States.  On July 1, 2014, the MPO Board unanimously approved a motion encouraging FHWA to conduct an EIS. Despite all of this, the EA/SOF prepared by the Corps did not address the need for an EIS.

**The CWA Section 404 Permitting Process**

94.     The Corps published notice of receipt of the CWA Section 404 permit application on August 15, 2015.  At that point the Corps began to receive comments on the permit application. But as mentioned herein, the Corps provided early feedback to FDOT and FHWA based on the premise that the Project would require a CWA permit. Throughout that time, the Corps expressed skepticism of the Project and in particular whether it would meet the 404(b)(1) guidelines. Once the Corps became the permitting agency, it received similar comments from the other resource agencies and most of the public. As demonstrated by the Public Notice Comment section of the EA/SOF, virtually every comment the Corps received starting in 2015 was in opposition to the Project.  The EA/SOF is inconsistent with prior positions of the Corps, does not discuss any comments received prior to 2015 and fails to address many comments sent to the Corps, including all of those sent by the City.  Incredibly, the Corps issued the permit with no changes to the Project,

no additional evaluation of alternatives, no new mitigation and without addressing water quality impacts from the stormwater system.

**Elevation by EPA and ARNI Designation**

95.     EPA expressed unequivocal concern regarding the impacts of State Road 7 to Grassy Waters Preserve. The EA/SOF labors to respond to the EPA's concerns but ultimately comes up short.

96.     On September 28, 2015, EPA submitted a letter to the Corps requesting that the applicant provide information on planned measures to avoid and minimize onsite freshwater wetland impacts. EPA's "3(a)" letter also requested alternative and cumulative impact analyses for the Project. EPA further expressed concern "that it is likely that there will be substantially or potentially significant long-term impacts to Grassy Waters Preserve from roadway contaminants including heavy metals and other hazardous substances."

97.     On October 16, 2015, EPA sent a letter to the Corps indicating that the permit for the Project is not approvable as proposed, because it did not comply with the CWA Section 404(b)(l) Guidelines.  Noting that the Project will impact 25.2 acres of hydric pine flatwoods, EPA stated that the agency considers hydric pine flatwood systems to be ARNI because they are threatened habitats that provide nesting, resting, and feeding sites for a wide variety of wildlife species.  EPA's "3(b)" letter also stated that the agency considers the large tracts of freshwater wetlands that remain in Palm Beach County to be ARNI, explaining that wetlands located in developing areas are essential to the region, because they provide important water quality and wildlife benefits.  Finally, EPA noted that the Project proposes to impact 17.6 acres of freshwater marsh, which consists of saw grass, soft rush, and maidencane.  EPA considers sawgrass wetlands also to be ARNI due to their role in protecting water quality and habitat values.

98.     EPA made clear that the proposed Project will have substantial and unacceptable impacts to hydric pine flatwoods, sawgrass, and large tracts of the remaining freshwater wetlands in Palm Beach County that they consider to be ARNI. In addition, the Project as proposed may have an adverse impact on a drinking water source for the City of West Palm Beach should a toxic spill occur along the proposed road extension alignment. EPA concluded that because the agency was not provided sufficient additional information to allow it to determine that the Project complies with the CWA Section 404(b)(1) Guidelines, EPA must conclude that it does not and that a permit for the Project is not approvable, as proposed. This triggered the elevation procedures outlined in Part IV, Elevation of Individual Permits, Paragraph 3(b), of the 1992 Memorandum of Agreement between the EPA and the Department of the Army regarding Section 404(q) of the CWA.

99.     On March 7, 2016, the Corps responded to EPA by providing information that was developed by FDOT.  In response to concerns regarding 404(b)(1), the Corps simply repackaged the two older corridor studies and quoted from the EA, again asserting that all western alternatives would lead to residential relocations, flooding concerns and would not meet the overall Project purpose and need. The Corps asked EPA to reconsider its objections based on this information. This did not meet the dispute resolution requirements of the 1992 MOA.

100.    On March 31, 2016, the EPA reiterated its concerns with the Project and did not withdraw its objections.

101.    On June 9, 2017, without any explanation, EPA stated that the agency would not request a higher level of review for the Project under Part IV, paragraph 3(d)(l) of the 1992  MOA. Yet, the Project was not changed, no new alternatives were analyzed, no new mitigation was

offered and the applicant did not address potential impacts on water quality.  There is nothing to explain this complete about-face.

**The Corps' 2017 EA/SOF**

102.     The Corps issued an EA/SOF constituting the Environmental Assessment, 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for issuance of the CWA Section 404 permit. In many cases the Corps simply adopted the prior work and reasoning of the FHWA and repeated that agency's previous mistakes.  In other areas, the Corps ignored facts and simply deferred to FDOT. Reliance on incomplete and inaccurate information violates NEPA's purposes of ensuring informed decision-making and an informed public.

103.     The supposed purpose of the Project has changed over time. In FDOT's 2007 PD&E Study, the purported purpose of State Road 7 was to "improve system linkage with the western fringes of urbanized Palm Beach County and provide additional capacity to ease the congestion experienced within the area . . ." and also to "facilitate the hurricane evacuation process by providing additional capacity and connectivity in the area." The stated purpose of State Road 7 in FHWA's January 25, 2012 EA was "to provide an efficient connection between Okeechobee Boulevard and Northlake Boulevard for the western areas of Palm Beach County," Unlike these previously stated purposes, the Corps' 2017 EA/SOF states that the "purpose of the project is to extend State Road 7 to Northlake Blvd."  The Corps makes clear that the existing road is the "Segment 1" of State Road 7 and that the proposed Project is "Segment 2."

104.     The purpose of the Project is defined so narrowly that it can only be constructed in a single location – Segment 2 can only attach to Segment 1.  In addition, the fact that the Corps allowed for illegal segmentation of a large project cannot justify allowing the next piece to be constructed. The Corps' failure to provide comprehensive analysis of all of the segments of the

Project at once, which limits the choice of reasonable alternatives available to the federal decision makers in the future, is a violation of NEPA.

105.    The narrow purpose of the Project infected the analysis of alternatives by predetermining the outcome. The 2017 EA/SOF states that the Project need is consistent with certain transportation plans. Yet, traffic studies submitted to FHWA demonstrate that the stated need for State Road 7 is vastly inflated and that an alternative route west of the Golf and Country Club residential development is viable to meet any traffic demands.  Thus, the Corps made the same mistakes as FHWA in its consideration of alternatives. The Corps has an independent responsibility to comply with NEPA, pursuant to 33 C.F.R. § 230.21, and should not have adopted the flawed alternative analysis from the transportation agencies.

106.    The 2017 EA/SOF narrowly defined the scope of direct and indirect effects.  For example, the Corps took the position that the State Road 7 Project had independent utility and on that basis limited its analysis of impacts to the narrow corridor of the Project.

107.    The EA/SOF states that the Project will not stimulate future development but rather that construction of past development (Ibis Golf and Country Club residential development) is the stimulus for the Project. This is unsupported by the record (and inconsistent with how FHWA defined the Project's purpose), given that there are numerous projects whose development orders are premised on construction of State Road 7. Thus, the EA/SOF failed to address a major growth-inducing impact.

**The 404(b)(1) Guidelines**

108.    The Corps' determination that there were no practicable alternatives to avoid and/or minimize environmental impacts was contrary to the evidence in the record, and thus violated the requirements of Section 404(b)(1), which is more demanding than NEPA.  The Corps took over

this Project after FHWA had already completed its review and set the Project location.  No new analysis was performed for the Corps.  Allowing the agencies to eliminate viable, technically superior, shorter, and less-costly alternatives from consideration before submitting the permit application violates both the CWA's requirements to undertake vigorous 404(b)(1) analysis as well as obligations under NEPA § 102(2)(E) to consider appropriate alternatives in the face of conflicts over use of resources.

109.    For decades, the Corps, the public, USFWS and EPA expressed skepticism with the rigorousness of the alternatives analysis presented by FDOT. During its consideration of the permit, the Corps was presented information demonstrating that there were practicable alternatives that would result in considerably less environmental impacts. In reaching its determination to issue the permit, the Corps ignored this contradictory factual information concerning alternatives and failed to independently analyze practicable alternatives.

110.    The Corps blindly accepted FDOT's assertions that alternative sites to the west that would clearly have less impacts were not practicable due to residential relocation, lack of use by regional traffic, and the potential for flooding from crossing canals.  This was contrary to the record and was never property tested by the Corps as required under 404(b)(1). Every alternative examined—with the exception of the straw-man alternatives of placing the roadway down the middle of the Rangeline (Corridor 4) or the County's preserve (Corridor 2)—would have completely avoided impacts to wetlands, endangered species and Grassy Waters Preserve. The Corps was provided information that these were feasible alternatives from a technical standpoint and that the residential impacts were not as significant as FDOT claimed as well as additional traffic studies that are not referenced in the EA/SOF.

111.    Given the emphasis that the transportation agencies placed on the cost of relocating property owners, in comparing alternatives, the Corps should have required the applicant to include the acquisition cost of the right-of-way for the preferred alternative as well as the cost of wetlands and species mitigation (the EA/SOF notes that wetlands mitigation can cost $100,000 per credit), as requested by the EPA.  This would allow for objective comparison of costs of alternatives.  The applicant, however, did not offer this information as reflected in the EA/SOF, which stresses the land acquisition costs for the western alternatives as a reason to reject them but does not honestly compare them to the costs of the preferred alternative.  This improperly tilted the alternatives analysis towards FDOT's preferred alternative.   In sum, the Corps did not fulfill its duty to independently verify the information from the applicant. The record here demonstrates that there are less environmentally damaging alternatives to the corridor chosen and that the Corps violated Section 404(b)(1) by failing to independently and critically evaluate whether that alternative was "practicable."

112.    The 404(b)(1) Guidelines also prohibit a discharge that will "cause or contribute to significant degradation of [U.S.] waters."  In deciding whether to permit this Project, the agencies must evaluate—and make careful factual findings regarding—the extent to which the roadway and its operation will individually or cumulatively contribute to significant degradation of the environment including, but not limited to, adverse effects to human health or welfare, wetlands and other special aquatic sites, fish and wildlife habitat and populations, and aquatic ecosystem diversity, productivity, and stability.   Current and future operation of the road and the Ibis stormwater management system will substantially degrade the water quality of Grassy Waters Preserve. Yet, the agencies ignored this requirement, instead choosing to defer to the South Florida Water Management District and its faulty findings (explained in more detail in Paragraphs 119-

125 below) concerning the ability of a failing stormwater management system to protect water quality and whether it met local design criteria.  The Corps' determination that there would be no significant degradation of waters of the United States was contrary to the evidence in the record.

**The Mitigation Plan**

113.    The Corps' determination that FDOT's mitigation plan will be successful and offset wetlands losses as expected or required is unfounded, unexplained, contrary to the evidence in the record and fails to consider necessary issues.

114.    The State Road 7 mitigation plan cobbles together a combination of three off-site locations and on-site restoration:  purchase of 0.66 Modified Wetland Rapid Assessment Procedure (M-WRAP) credits from the Loxahatchee Mitigation Bank; allocation of credits at Palm Beach County's Pine Glades Permittee-Responsible Off-Site Mitigation Area (**PROMA**); and credit allocation at South Florida Water Management District's Dupuis Reserve PROMA.  The off-site mitigation locations of Dupuis and Pine Glades are miles from the Project and are not the same types of wetlands found in the Grassy Waters Preserve ecosystem. These off-site mitigation areas are managed by the permittees themselves and were picked for that simple convenience.  However, not enough credits were available at these locations. Therefore, the permittees had to purchase credits from the Loxahatchee Mitigation Bank, despite statements by the Corps that this bank is not appropriate. Neither Dupuis nor Pine Glades are open marsh oligotrophic, long hydroperiod, low nutrient wetlands, they do not support the same species and they are miles away from the Project's impacts. There is no hydrological connection between these mitigation sites and the Project area.

115.    The Corps determined that there will be 159.96 acres of secondary impacts based on a 300 foot buffer from the limits of the Project's construction. The permit is premised on a

number of mitigation proposals, such as wildlife fencing and tree planting, that will do little to mitigate the impacts of construction and operation of this roadway adjacent to an area as sensitive as Grassy Waters Preserve. The permit also does not address the fact that the proposed roadway will result in fragmentation of the Ibis Preserve, located just south of the Ibis Golf and Country Club residential development, which will be ringed in by the road.

116.    The EA/SOF also indicates that the 159.96 acres of secondary impacts to Grassy Waters Preserve will be mitigated through wetland creation, restoration and enhancement in 52.4 acres of right-of-way adjacent to the roadway.  However, this mitigation plan for wetland creation contains none of the detailed requirements or assurances required for Permittee-responsible mitigation. 33 C.F.R. Part 230 Subpart J. Thus, this mitigation cannot be counted towards the approximately 160 acres of secondary impacts.

117.    Overall, the mitigation does not have any direct compensation value to the wetlands lost and is inconsistent with Subpart J of the Corps' regulations.

**Degradation of water quality**

118.    As explained above, stormwater runoff from 3.145 miles of the northern segment of State Road 7 would be routed to an existing surface water management system associated with the Ibis Golf and Country Club residential development. Stormwater runoff from State Road 7's roadside swale would either percolate into the groundwater (thereby flowing into the adjacent Grassy Waters Preserve) or be routed into the Ibis Lakes, which are meant to provide water quality treatment. The Ibis Lakes then flow into the Ibis Preserve, which is owned by the City. Water from the Ibis Preserve is discharged into Grassy Waters Preserve over an outfall.

119.    In addition to requiring the CWA 404 permit that is being challenged in this action, State Road 7 also required a state environmental resource permit (**ERP**) from the South Florida

Water Management District (**SFWMD**). In 2016, the City filed a Petition for Formal Administrative Proceeding, challenging the proposed issuance of the ERP for the Project on the grounds that State Road 7 will have direct and indirect impacts on Grassy Waters Preserve and the Ibis Preserve by discharging into low nutrient wetlands increased levels of nutrients, sediment, and contaminants associated with the roadway. During the state administrative hearing, the City provided expert analysis demonstrating that the stormwater management system serving the Ibis Golf and Country Club is already introducing phosphorous and other pollutants into the oligotrophic wetlands of Grassy Waters Preserve. Changes to vegetation caused by the Ibis stormwater management system already extend out over a mile from the outfall into Grassy Waters Preserve.

120.    The EA/SOF concludes that the Project will have a negligible effect on water quality and will not contribute to significant degradation of "waters of the US" because of the swale and the water quality treatment of the Ibis system. In turn, the EA/SOF requires a stormwater design that will not result in hydrological changes to the surrounding wetlands and snail kite habitat as a means of reducing secondary impacts. The EA/SOF also relies on a functioning stormwater management system to support the claim that the Project will not affect the water supply of the City. The EA/SOF concludes that there will be no impact on the Ibis community's lakes and waterways.

121.    The Ibis stormwater management system is failing and cannot handle additional stormwater. State Road 7 will push more water and nutrients into Ibis's lakes, thereby flushing existing pollutants (present in both the standing water and in the muck on the lake bottoms) from such lakes into Grassy Waters Preserve (particularly during storms with heavy rainfall). In addition, the drainage swale that is to be constructed along the side of the proposed roadway is

designed so stormwater and pollutants will percolate into the groundwater within 24 hours, where it will then migrate into Grassy Waters Preserve 175 feet away.  Thus, whether the stormwater from State Road 7 travels through the Ibis system or through the swale, State Road 7 will result in increases in nutrient loads in Grassy Waters Preserve. The introduction of additional nutrient laden runoff from State Road 7 into Grassy Waters Preserve will permanently alter water quality and will change the balance of flora and fauna in the vicinity of the Project, eliminating the periphyton and allowing nuisance species such as cattails to take over.  Once a wetland ecosystem loses its periphyton communities, it causes a cascade of ecological changes that is difficult, if not impossible, to reverse.

122.    SFWMD tacitly acknowledged the legitimacy of the evidence presented by the City's expert witnesses at the administrative hearing that showed that the Ibis Lakes are not currently providing sufficient water quality treatment to prevent harmful nutrient impacts in Grassy Waters Preserve. Before the administrative hearing had even concluded, the SFWMD filed two Administrative Complaints and Orders for Corrective Action demanding that efforts be made to improve water quality treatment in the Ibis Lakes and Ibis Preserve.[1] In both complaints, SFWMD acknowledged that until the City raised the issues, SFWMD was not aware of the problems with water quality treatment in the Ibis Lakes or with nuisance nutrient-generated vegetation in the area where water that travels through the Ibis Lakes enters Grassy Waters Preserve. SFWMD stated in the complaints that "[p]rior to receiving evidence provided by the City, the District did not have information to indicate that regular removal of sediment [in Ibis Lakes] was not occurring." The SFWMD went on to say that "[t]he District has reviewed the City's

---

[1] These Administrative Complaints and Orders for Corrective Action are *SFWMD v. Northern Palm Beach County Improvement District*, SFWMD No. 2016-057-DAO-ERP (Sept. 13, 2016) and *SFWMD v. City of West Palm Beach*, SFWMD No. 2016-056-DAO-ERP.

evidence and concludes that there currently is an issue with nuisance vegetation and vegetation that grows preferentially in areas of high nutrients at the City's Ibis Preserve discharge point into Grassy Waters."

123.    In August 2017, the SFWMD filed an amended complaint.  In this complaint, the SFWMD adopted the City's experts' analysis and alleged that the increase of nuisance and exotic vegetation in Grassy Waters Preserve near the Ibis Preserve outfall constitutes an imbalance in the natural populations of aquatic flora and fauna and therefore is a violation of Florida's water quality standards. SFWMD, in its complaint (ironically filed against the City as the owner of the outfall) asserted that these are adverse impacts that are inconsistent with the District's objectives to protect water quality resources and that the water quality impacts must be eliminated.  To date, no work has been done to correct the problems and the Ibis stormwater system continues to discharge harmful concentrations of nutrients into Grassy Waters Preserve.  Yet, the Corps relies on the water quality certification for the same system that SFWMD admits is currently violating water quality standards.

124.    Incredibly, the administrative law judge determined that under Florida rules, a violation of the narrative nutrient surface water quality standard would only occur upon the "near-destruction" of all 23 square miles of the otherwise pristine Grassy Waters Preserve before an "imbalance in the natural populations of aquatic flora and fauna" would be enough for the state to intervene. The City's challenge to ERP issued by the SFWMD is currently under appeal before Florida's Fourth District Court of Appeal.

125.    The fact that the Ibis system is currently harming Grassy Waters Preserve is incontrovertible. Increasing the volume of stormwater and volume of nutrients in a failing stormwater management system that has its ultimate discharge point into Grassy Waters Preserve

will result in considerable harm. Nonetheless, many of the conclusions of the EA/SOF are predicated on the supposed protections of this system. The Defendant agencies appear to have deferred to the SFWMD determination, despite the fact that it is inconsistent with the federal requirements on degradation. The discharge will contribute to significant degradation of "waters of the US" through impacts to Grassy Waters Preserve.

**Endangered Species Act Consultation-failure to reinitiate consultation**

126.    Grassy Waters Preserve is occupied habitat of the endangered Everglade snail kite. Recovery and conservation of the snail kite depends on maintaining a network of suitable habitat that support snail kite breeding and foraging. Grassy Waters Preserve (which has managed water levels) has been critical in supporting snail kite and apple snail populations, particularly when other areas of snail kite habitat have been too dry to support snail kite foraging. Snail kites have been documented foraging in the proposed right-of-way of the Project and active nesting colonies are in the vicinity of the proposed roadway.

127.    On February 29, 2012, USFWS requested formal consultation on the Project, due to the impacts on the snail kite and wood stork.

128.    On February 13, 2012, USFWS expressed serious concerns regarding the snail kite population's ability to withstand the likely adverse effects of the Project.  USFWS strongly urged the FHWA to discard the proposed corridor for the Project and adopt a new corridor that would minimize or eliminate adverse effects to the snail kite.

129.    USFWS issued its BiOp on November 13, 2014. The BiOp notes that Grassy Waters Preserve "is an important refugium for snail kite feeding and nesting when less favorable environmental and hydrologic conditions occur and the availability of apple snails is reduced in other parts of the snail kite's range." Grassy Waters Preserve is clearly essential to species

breeding, feeding, sheltering and recovery, it has "significant use" by the snail kite and is a "critical refuge."

130.     The BiOp further explains that "the Service believes the number of snail kites using the action area is likely greater than indicated by the nesting data."

131.     The BiOp concludes that degradation of the water quality of wetland habitats through runoff of phosphorus and nitrogen from agricultural and urban sources (cultural eutrophication) can adversely affect the snail kite.

132.     The BiOp makes clear that the proposed road will have a devastating impact on the snail kite population (which has a 95% chance of being extinct within the next 40 years). The Service concludes that this Project will result in the direct and indirect loss of 273 acres of snail kite habitat. The direct effects include: (1) the permanent loss of habitat for snail kites and their prey; (2) a reduction in the geographic distribution of habitat for the species; and (3) harassment of snail kites due to construction activities. In turn, the Project's indirect effects include: (1) an increased risk of snail kite mortality from collisions with motor vehicles using the new roadway; and (2) increased disturbance to the snail kite in the Project vicinity due to motor vehicle operations. Given these concerns, USFWS urged the FHWA to undertake an EIS and to choose an alternative alignment that would avoid impacts to Grassy Waters Preserve.

133.     Despite these conclusions, the BiOp narrowly defined the scope of the impacts of the Project, discounted the effects on the overall population of the snail kites and failed to require reasonable mitigation of impacts through reasonable and prudent measures and terms and conditions.

134.     The BiOp utilizes habitat loss as a surrogate for species take and does not quantify the amount of take with a number of species.  The reasonable and prudent measures consist mainly

of requiring the placement of an easement on 216 acres of FDOT's Rangeline Corridor and setting aside some money for maintenance. This is land that has already been restored by Palm Beach County. During the NEPA process, the agencies made clear that this land will never be developed due to its location and environmental sensitivity. Thus, these are measures that the County is already undertaking. The BiOp contains no conservation recommendations. Given that no habitat is actually purchased, restored or protected, the Project will result in net loss of hundreds of acres of kite habitat.

135.    On April 29, 2015, the City sent a 60-day Notice of Intent to Sue to USFWS and FHWA noting the numerous flaws of the 2014 BiOp.

136.    On March 6, 2017, the City requested that USFWS reinitiate consultation because the Project will have direct effects on endangered species and their habitat that exceed the scope of the incidental take statement of the 2014 BiOp. The agencies were provided the following: (1) information from the SFWMD hearing demonstrating that the stormwater management system for the Project will cause significant habitat modification or degradation that will result in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering; (2) modifications to the Project that increase direct wetlands impacts; and (3) information concerning the presence of red-cockaded woodpeckers in Grassy Waters Preserve. However, based on an email with FDOT, USFWS determined not to reinitiate consultation. Thus, the agencies failed to address the ongoing and future impacts on snail kites and other species that will occur due to the changes to nutrient levels in Grassy Waters Preserve. Given the BiOp's acknowledgement of the effects of changes in nutrients, this is a significant failure.

## COUNT I

## VIOLATIONS OF NEPA

137.    Plaintiff incorporates the allegations of paragraphs 1-136 herein.

138.    FHWA and the Corps have violated NEPA and its implementing regulations, and have acted arbitrarily and capriciously in violation of the APA. 5 U.S.C. § 706(2) in the following manner: failing to prepare an EIS; approving the Project without taking a hard look at the environmental impacts of the permit, including direct, indirect, incremental and cumulative impacts; failing to require objective analysis of a reasonable range of alternatives; relying on an unreasonably narrow and unsupported purpose and need statement; and failing to provide adequate and accurate information in the EA to inform the public of the full scope of the Project's environmental effects.

## COUNT II

## VIOLATIONS OF THE CWA

139.    Plaintiffs incorporates the allegations of paragraphs 1-136 herein.

140.    The Corps and EPA have violated Section 404 of the CWA and its implementing regulations, and have acted arbitrarily and capriciously in violation of the APA. 5 U.S.C. § 706(2), in the following manner:  failing to select the least environmentally damaging, practicable alternative for the proposed roadway; failing to require the applicant to avoid and minimize impacts to waters of the United States; issuing a permit that will result in significant degradation of waters of the United States; failing to provide adequate protection of the ARNI; approving a mitigation plan that will not replace the functions lost as a result of the Project; failing to undertake an adequate public interest review and to properly weigh the benefits of the Project against its reasonably foreseeable detriments including secondary and cumulative impacts; and failing to condition the permit properly.

## COUNT III

## VIOLATIONS OF THE ESA

141.    Plaintiff incorporates the allegations of paragraphs 1-136 herein.

142.    The Corps, FHWA and USFWS violated section 7 of the ESA, 16 U.S.C. § 1536(a), and its implementing regulations, and have acted arbitrarily and capriciously in violation of the APA. 5 U.S.C. § 706(2) in the following manner: failing to ensure that the Project will not jeopardize the snail kite and the wood stork; failing to use the best available data; failing to clearly articulate the level of "take"; and failing to properly condition the BiOp to minimize impacts to species.

143.    The failure to reinitiate consultation, *see* 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.16, to address information received by the agency since 2014, constitutes a violation of ESA Section 7(d), which prohibits the "irretrievable commitment of resources" pending completion of consultation. 16 U.S.C. § 1536(d).  In addition, in failing to reinitiate consultation for the snail kite and red-cockaded woodpecker, the agencies are is in violation of their duty under ESA Section 7(a) to insure that agency action is not likely to jeopardize the continued existence of listed species. 16 U.S.C. § 1536(a)(2),(4).

## PRAYER FOR RELIEF

In light of the claims set forth above, Plaintiff requests the Court to issue an order:

(1)    declaring that the FHWA's NEPA documents, the Corps' issuance of the permit and the USFWS' concurrence letter violated the Endangered Species Act, the Clean Water Act, National Environmental Policy Act, and their implementing regulations, and the Administrative Procedure Act;

2)    preliminarily and permanently setting aside the Clean Water Act Section 404 permit and related documents, the USFWS BiOp and the FHWA's EA/FONSI;

(3)    awarding plaintiff their costs and reasonable attorneys' fees, including expert fees; and

(4)    awarding plaintiff any other relief that is just and proper.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: _/s/  Rafe Petersen_____
        Rafe Petersen (Bar #465542)
        Aaron Heishman (Bar #1011910)
        800 17th Street, NW Suite 1100
        Washington, D.C. 20006
        Telephone: (202) 955 3000
        Facsimile: (202) 955 5564
        E-mail: rafe.petersen@hklaw.com
        E-mail: aaron.heishman@hklaw.com

*Counsel for Plaintiff City of West Palm Beach*

#53195289_v8